Filed 5/29/15  P. v. Loredo CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SUSANA LOREDO,<br><br>        Defendant and Appellant. | A140364<br><br>(San Francisco County<br>Super. Ct. No. 220507) |

Defendant Susana Loredo attempted to purchase merchandise worth approximately $4,400 with a credit account she fraudulently opened in someone else's name, and a jury convicted her of five felonies, including identity theft and burglary.  On appeal, her only claim is that her convictions must be reversed because the trial court refused to give the jury a pinpoint instruction on duress.  We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In June 2013, Loredo applied for a credit account at a Neiman Marcus outlet store in Livermore.  She approached a sales associate, asked to apply for credit, and presented a driver's license and a credit card that both falsely identified her as a woman named F.B.  Loredo's application was approved, and she received a referral slip that could be used as a temporary card.  The sales associate who helped her open the account testified that Loredo smiled during their interaction and did not appear "distressed," "nervous," or

1

"afraid." Loredo did try to "rush" the associate, however, and after opening the account, she told the associate that "she had a family emergency and she had to leave."

Later that day, Loredo went to a Neiman Marcus store in San Francisco and tried to buy about $4,400 worth of men's shoes with the referral slip. The sales associate helping her contacted the loss-prevention department to obtain the account number, which was not on the slip, and was told to "stall." Loredo remained calm while she waited, although she was "[p]erspiring a lot." Meanwhile, a loss-prevention manager looked up the account using F.B.'s name and discovered it had been opened earlier that day. He called the telephone number associated with the account and eventually reached F.B., who told him that she had not opened the account or authorized anyone to do so on her behalf.

The sales associate completed the purchase, as he was directed to do, and the manager then approached Loredo and asked her to accompany him back to the loss-prevention office. She agreed to do so, and she soon confessed that she was not F.B. The fraudulent driver's license and credit card in F.B.'s name, along with Loredo's own driver's license and Social Security card, were found in her possession. Loredo told the manager that a man had given her the counterfeit forms of identification and had brought her to the San Francisco store. She said she had attempted to buy men's shoes because " '[t]hat's what [she] was supposed to buy' " and that she would have received money had the purchase been successful. Another loss-prevention employee testified that Loredo said the same man "made [Loredo] do it." After her arrest, Loredo told a police officer that "she messed up" and had "recently joined a crime ring that steals people's identities."

The prosecution also presented evidence of prior misconduct. A former loss-prevention officer for JCPenney's testified that in March 2009 Loredo was caught stealing clothes from a Cupertino store by hiding them in her jacket. Loredo told the employee that she needed the items to cover her rent.

At trial, Loredo testified that she was forced to commit the fraud. She began by recounting a long history of physical and verbal abuse by her husband, with whom she

2

had three children. He routinely beat her, called her derogatory names, and told her she "was worthless." On one occasion when she was pregnant with her oldest son, her husband pointed a gun at her stomach and said that she "was a whore, the baby wasn't his, and that he could just pull the trigger and the baby would be gone." They eventually separated in 1999, although they remained legally married.

In August 2012, Loredo went to her father-in-law's house after her husband accused her of stealing money from him and his father. Her husband grabbed her throat and held her down while his father burned her hand with a torch, punched her in the face, and kicked her in the stomach. They eventually let her go after her father-in-law told her he could have killed her. Loredo reported the incident to the police and entered a domestic-violence shelter with her two younger children, but she had to leave to have surgery due to a head infection related to the assault.

In the spring of 2013, Loredo met a man she knew as "Biz" through a dating website, and they began talking by telephone. Biz put her in contact with another man, "Twin," whom she eventually began dating. Twin treated her well for a couple weeks but then he told her "that he was going to take [her] to get a [passport] picture taken at Walgreens . . ., and that he was going to have an ID made out for [her], and that he needed [her] to memorize some information." Loredo had the photograph taken without questioning Twin "[b]ecause in [her] experiences with [her] ex, you don't question another man."

The day before the Neiman Marcus incidents, Twin drove Loredo to a number of stores in San Jose and told her to apply for credit with the driver's license and credit card in F.B.'s name that he provided. At two of the stores, she applied for credit, but it was denied. At two others, she did not actually apply for credit because she "was scared" and "didn't want to do this," although she told Twin that she had applied but had been unsuccessful for various reasons. Twin then drove her to San Francisco, where he met with two men, one of whom had a gun, and returned to the car with "a lot of cash." The scene "gave [Loredo] the creeps," and she decided she could no longer participate in Twin's fraud scheme.

3

The next day, Twin repeatedly called Loredo and eventually showed up at her niece's house in San Jose.[1] Loredo approached his car and told him she "didn't want to do this," at which point he "reach[ed] down underneath his seat,"[2] quickly "jumped" out of the car, and said, " 'Bitch, this is not a game.' " She testified, "He said not to fuck with his money, he knew where my daughter was at, he knew where my family was at, and that he would kill them if I didn't do what he say, and that I need to get my ass in the car and make him his money." Loredo was scared because she perceived his words as a serious threat and his behavior reminded her of her husband's, and she got in the car.

Twin drove Loredo to a JCPenney's store in San Jose. She told him she attempted to obtain a temporary shopping pass for F.B.'s existing account there but was unsuccessful because she could not provide F.B.'s maiden name. They then drove to the Neiman Marcus outlet store in Livermore, and Twin directed Loredo to get "instant credit" and told her, " 'Bitch, don't fuck with my money. This isn't a game. I ain't fucking with you.' " Loredo went inside and applied for a credit account because she "feared for [her] life at that point" and was "really scared."

After Loredo successfully opened the account, Twin drove her to the Neiman Marcus store in San Francisco, where he directed her to purchase several expensive pairs of men's designer shoes. After initiating the transaction, she "had a feeling [she] was going to get caught" because "it was taking too long," but she did not leave because she "was thinking of [her] daughter and [her] family and [her]self and [their lives] and how [they] had been threatened." She claimed she never attempted to contact the authorities throughout these events because she had no "faith in [the] law" because her husband was not arrested for beating her.

---

[1] The defense presented numerous screenshots of Loredo's cell phone which, while not in the record before us, apparently indicated that a contact named "Twin" called Loredo several times throughout the period in question and sent her text messages directing her actions in the stores.

[2] Loredo testified that she believed Twin was reaching for a gun because her husband kept his gun under the driver's seat of his car, but she later admitted that she never actually saw a gun.

Loredo was charged with felony counts of identity theft, second degree burglary, attempted grand theft of personal property, possession of a forged driver's license, forgery of a document, and fraudulent use of an access card.[3] The information also alleged that she had suffered convictions resulting in a prior prison term.[4] Trial on the prior-prison-term allegation was bifurcated.

The jury acquitted Loredo of the document-forgery count but found her guilty of the remaining five counts. The same jury hung on the prior-prison-term allegation and the trial court declared a mistrial, after which a new jury was impaneled and found the allegation true. The court sentenced her to three years in county jail, comprised of terms of two years for the identity-theft count and one year for the prior prison term. It then suspended the last 18 months of the sentence and placed her on mandatory supervision during that time under section 1170, subdivision (h)(5)(B). Terms for the other counts were imposed but stayed under section 654.

## II.
### DISCUSSION

#### A.    *Additional Facts.*

The trial court instructed the jury on duress under CALCRIM No. 3402 in part as follows:

> The defendant is not guilty of Counts 1 through 6 . . . if she acted under duress. The defendant acted under duress if, because of threat or menace, she believed that her or someone else's life would be in immediate danger if she refused a demand or request to commit the crimes. The demand or request may have been express or implied.

> The defendant's belief that her or someone else's life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to

---

[3] Loredo was charged under Penal Code sections 530.5, subdivision (a) (identity theft), 459 (burglary), 487, subdivision (a) and 664 (attempted grand theft), 470b (possession of forged driver's license), 470, subdivision (a) (forgery of a document), and 484f, subdivision (b) (fraudulent use of access card). All further statutory references are to the Penal Code.

[4] The prior prison term was alleged under section 667.5, subdivision (b).

5

and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed.

At the conference on jury instructions, Loredo's trial counsel had requested that the duress instruction be modified to add the following language at the end of the second paragraph: " 'In making this determination, you may consider all the elements in the case which might be expected to operate on her mind, including the effects of intimate partner battering.' "

The trial court denied Loredo's request, stating, "[W]hile I agree that her proposed modification is an accurate statement of the law, I believe the principle that [her counsel] wanted to add is already captured in [CALCRIM No.] 3402 . . . [¶] . . . in the second sentence of that second paragraph . . ., so I think it would be redundant to add it and then improperly focus on one particular piece of evidence." The court indicated that Loredo's counsel could, however, "argue that principle and point out that evidence in . . . closing." In closing argument, Loredo's counsel did just that by arguing at length that Loredo's history of abuse was significant in establishing that Loredo acted under duress.

### B. The Trial Court Properly Declined to Give the Requested Pinpoint Instruction Because It Was Argumentative.

" 'A trial court must instruct on the *law* applicable to the facts of the case' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1244, italics in original), and " 'in appropriate circumstances[,]' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . . But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) An instruction is argumentative if it is " ' "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." ' " (*Hajek and Vo*, at p. 1244.)

Loredo argues that the additional language she requested was not redundant because the given instruction's direction to " 'consider all the circumstances as they were

6

known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed' " could not have "reasonably [been] viewed by a [juror] as permission . . . to consider evidence of physical and verbal abuse." She claims that "without the modification, the jury could not consider that evidence when determining whether [she] acted under duress." We disagree. We fail to see how the instruction given, CALCRIM No. 3402, precluded the jury from considering Loredo's history as a victim of domestic abuse. In fact, the instruction explicitly permitted consideration of her subjective perception by directing the jury to evaluate the circumstances as they appeared to *her* and the belief of a reasonable person in *her* situation. In short, the requested additional language was unnecessary to inform the jury that it could consider Loredo's testimony about past abuse in determining whether she acted under duress.

Loredo also contends that the trial court incorrectly determined that the pinpoint instruction "impermissibly highlighted evidence." She likens the requested modification to CALCRIM No. 372, the flight instruction, which she characterizes as "focuse[d] on specific evidence favorable to the prosecution" and required to be given if evidence of flight "is relied on by the prosecution to support an inference of guilt." But by directing that flight alone cannot establish guilt—*a principle of law*—CALCRIM No. 372 protects defendants by preventing the jury from attaching too much significance to specific evidence. (See CALCRIM No. 372.) The pinpoint instruction here, in contrast, did not further instruct on the applicable law but only prompted the jury to focus on the evidence of domestic violence in considering the duress issue. As a result, we conclude the instruction was argumentative and the court properly declined to give it.

Moreover, even if the denial of the requested language was erroneous, it is not reasonably probable that the verdict would have been different had the trial court used that language. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) A significant portion of Loredo's testimony was about her past experiences with her husband and their effect on how she reacted to Twin. In closing argument, her trial counsel argued at length that Loredo's history of being abused was significant in establishing that she acted under

7

duress. In addition, the prosecutor urged the jury not to accept Loredo's claim that she was under duress but did not seek help from the police because of her past experience as a victim of domestic violence. (See *People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1663-1664 [any error in failure to give pinpoint instruction on self-defense harmless where "[b]oth the defense counsel and the prosecutor thoroughly aired [the instruction's] subject in argument"].) Given the emphasis on Loredo's history of domestic abuse in the evidence and arguments, it is unlikely that the jury "failed to give [her] position full consideration." (*Id.* at p. 1665.) As a result, even if there had been error in omitting the pinpoint instruction, it was harmless.

### III.
### DISPOSITION

The judgment is affirmed.

                                   _____

                                   Humes, P. J.

We concur:

_____

Dondero, J.

_____

Banke, J.

*People v. Loredo* (A140364)

9